**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---------------------------------------------------------------X

MARK BARRY, GEORGE DIAZ, and LONG NGUYEN, on behalf of themselves, individually, and on behalf of all others similarly-situated,

Plaintiffs,

-against-

ANAQUA, INC.,

Defendant.

---------------------------------------------------------------X

Civil Action No.: __________

**COMPLAINT**

**COLLECTIVE ACTION PURSUANT TO 29 U.S.C. § 216(b)**

**DEMAND FOR JURY TRIAL**

Plaintiffs MARK BARRY, GEORGE DIAZ, and LONG NGUYEN ("Plaintiffs"), on behalf of themselves, individually, and on behalf of all others similarly-situated ("FLSA Collective Members"), by and through their attorneys, RUBERTO, ISREAL & WEINER, P.C., and STEVENSON MARINO LLP, as and for their Complaint against ANAQUA, INC. ("Anaqua" or "Defendant"), allege upon personal knowledge as to themselves and their own actions, and upon information and belief as to all other matters.

## NATURE OF THE CASE

1. This is a civil action for damages and equitable relief based upon Defendant's egregious and willful violations committed against Plaintiffs' rights guaranteed to them by: (i) the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a); (ii) the interference provisions of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2615(a)(1); (iii) the anti-retaliation provisions of the FMLA, 29 U.S.C. § 2615(a)(2); (iv) the overtime provisions of the Massachusetts Minimum Fair Wages Law, M.G.L. c. 151 *et seq.*; (v)

the wage payment provisions of the Massachusetts Wage Act, M.G.L. c. 149 § 148; and (vi) any other cause(s) of action that can be inferred from the facts set forth herein.

**PRELIMINARY STATEMENT**

2. Defendant Anaqua, Inc. is a software company with a national presence that provides intellectual property management software and services to law firms and corporations across the United States and internationally. Despite holding itself out as a technology leader serving sophisticated clients, Anaqua engaged in a systematic scheme to deny overtime compensation to its sales workforce by deliberately misclassifying them as exempt employees, forcing them to work long schedules of 50 to 80 hours per week from their home offices without paying a single penny in overtime.

3. At the heart of this misclassification scheme are two distinct positions that Anaqua fraudulently classified as exempt: Sales Managers and Account Executives. Plaintiffs Long Nguyen and George Diaz worked as "Sales Managers" whom Anaqua misclassified as outside sales employees exempt from overtime protections, while Plaintiff Mark Barry worked as an "Account Executive" whom Anaqua misclassified as an administrative employee. In reality, all three Plaintiffs performed identical traditional inside sales work from their home offices, conducting virtual product demonstrations, making discovery calls, building sales pipelines through email and phone outreach, and managing customer relationships through CRM systems. None possessed any meaningful managerial authority, supervisory responsibilities, or discretion over company operations that would justify exempt classification.

4. Anaqua's misclassification scheme was not a mere oversight or good-faith mistake. In early 2025, the company reclassified its Sales Development Representatives from exempt salaried positions to non-exempt hourly positions, tacitly admitting that these employees had been

unlawfully denied overtime compensation in violation of the FLSA. However, when Anaqua reclassified the Sales Development Representatives, it deliberately and willfully refused to reclassify Account Executives or Sales Managers, despite the fact that their job duties functioned largely identically to those of Sales Development Representatives. This selective reclassification reveals Anaqua's knowing violation of federal wage and hour laws and its calculated strategy to minimize financial exposure rather than comply with its legal obligations.

5. For Plaintiff Mark Barry, Anaqua's misconduct extended beyond wage theft. On July 21, 2025, Barry contacted Anaqua's Human Resources department to explore his options for taking medical leave for a necessary carpal tunnel surgery and to address work-related stress and anxiety. The very next day, HR provided Barry with FMLA paperwork and set a deadline of August 7, 2025 for submission of his medical certification. Within days of Barry's protected FMLA inquiry, senior management during a Teams meeting discussed Barry's removal.

6. On August 7, 2025, the exact deadline for Barry to submit his FMLA medical certification, Anaqua terminated his employment. The pretextual nature of Anaqua's stated reason is further exposed by the fact that Barry had received no prior disciplinary action and had just completed what he described as his best quarter ever by closing two significant deals.

7. Through this action, Plaintiffs seek to vindicate their rights under the FLSA and FMLA and to hold Anaqua accountable for its systematic wage theft affecting a nationwide workforce of similarly situated employees, as well as its unlawful retaliation against an employee who dared to exercise his federally protected right to medical leave.

8. Plaintiffs bring their unpaid wage claims on behalf of themselves, individually, and on behalf of a collective of similarly situated individuals pursuant to the FLSA.

9. Plaintiff Barry brings his FMLA claim and Massachusetts state law claims on behalf of himself, individually.

## **JURISDICTION AND VENUE**

10. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

11. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising out of the Massachusetts Minimum Fair Wages Law, and the Massachusetts Wage Act, and all other state law claims alleged herein.

12. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Specifically, Defendant's principal place of business is located in Boston, Massachusetts, and Plaintiff Mark Barry worked from his home office in Boston, Massachusetts throughout the relevant time period.

## **PARTIES**

### ***Plaintiff Mark Barry***

13. Plaintiff Mark Barry is an individual who, at all times relevant to this Complaint, was and is a resident of Suffolk County, Massachusetts.

14. Barry was employed by Defendant in Massachusetts as an Account Executive, Law Firms, from in or around December 13, 2021 through August 7, 2025.

15. At all relevant times herein, Barry was a "person" and an "employee" of Defendant within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(e).

16. Barry worked for Defendant continuously for at least twelve months preceding his FMLA leave request in July 2025. In addition, during the twelve-month period preceding Barry's FMLA leave request, Barry worked over 1,250 hours during that period, at a work location, specifically, his home office in Boston, Massachusetts, where Defendant employed at least fifty employees within seventy-five miles. Thus, at all relevant times herein, Barry was an "eligible employee" within the meaning of the Family and Medical Leave Act, 29 U.S.C. § 2611(2).

***Plaintiff George Diaz***

17. Plaintiff George Diaz is an individual who, at all times relevant to this Complaint, was and is a resident of Galveston County, Texas.

18. Diaz was employed by Defendant in Texas as a Sales Manager from in or around February 28, 2022 through October 2023.

19. At all relevant times herein, Diaz was a "person" and an "employee" of Defendant within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(e).

***Plaintiff Long Nguyen***

20. Plaintiff Long Nguyen is an individual who was employed by Defendant as a Sales Manager beginning in or around May 9, 2022, until in or around mid-August, 2023.

21. At all relevant times herein, Nguyen was a "person" and an "employee" of Defendant within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(e).

***Defendant Anaqua, Inc.***

22. At all relevant times herein, Defendant Anaqua, Inc. was and is a corporation with its principal place of business located at 31 St. James Avenue, Suite 1100, Boston, Massachusetts 02116.

23. Defendant owns, operates, and manages a software and intellectual property management services company, providing patent docketing, IP management software, renewal services, foreign filing services, data validation, portfolio onboarding, patent search services, and related products and services to law firms and corporate clients.

24. At all relevant times herein, Defendant was an "employer" within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(d). Defendant employed and employs two or more people, Defendant's qualifying annual business exceeds $500,000.00, and Defendant was and is engaged in interstate commerce within the meaning of the FLSA, as Defendant sells software and services to clients throughout the United States and internationally, accepts checks and credit card payments based on banking agreements with out-of-state companies, and conducts business operations across state lines on a daily basis, the combination of which subjects Defendant to the FLSA's overtime requirements as an enterprise.

25. The members of the FLSA Collectives alleged herein worked for Defendant throughout the United States, including but not limited to Massachusetts, Texas, Iowa, California, Arizona, New York, and other states, establishing the nationwide reach of Defendant's misclassification scheme and the appropriateness of conditional certification of nationwide collective actions under 29 U.S.C. § 216(b).

26. At all relevant times herein, Defendant was an "employer" within the meaning of the Family and Medical Leave Act, 29 U.S.C. § 2611(4), as Defendant employed fifty or more employees for each working day during each of twenty or more calendar workweeks in the current or preceding calendar year.

## FLSA COLLECTIVE ACTION ALLEGATIONS

*Sales Managers Collective*

27. Plaintiffs Long Nguyen and George Diaz seek to bring this suit to recover from Defendant unpaid overtime compensation and liquidated damages pursuant to the applicable provisions of the FLSA, 29 U.S.C. § 216(b), on their own behalf, as well as on behalf of those in the following collective:

> Current and former employees who, during the applicable FLSA limitations period, held the position of Sales Manager or similar title, worked remotely from their homes performing inside sales duties, and who consent to opt-in to this action ("Sales Managers Collective").

28. Defendant treated Plaintiffs Nguyen and Diaz and all Sales Managers Collective members similarly in that they all: (1) performed substantially similar inside sales job duties, including prospecting through phone calls, emails, and LinkedIn outreach, conducting discovery calls with prospects, facilitating virtual product demonstrations over Zoom or Teams, performing follow-up activities to advance sales opportunities, preparing proposals and sales materials, and managing customer relationships through Salesforce and other CRM systems; and (2) did not supervise employees, have direct reports, hire or fire personnel, conduct employee performance reviews, control budgets, or create company policy.

29. Defendant further treated all Sales Managers Collective members similarly in that they: (1) were classified as exempt outside sales employees despite working remotely from their home offices rather than making in-person sales calls in the field; (2) were required to work in excess of forty hours per workweek, typically ranging from fifty to sixty-five hours per week; and (3) were not paid the required one and one-half times their respective regular rates of pay for all hours worked per workweek in excess of forty.

30. At all relevant times, Defendant was aware of the requirements to pay Sales Managers Collective members at an amount equal to the rate of one and one-half times their respective regular rates of pay for all hours worked each workweek above forty, yet Defendant purposefully and willfully chose not to do so.

31. The precise number of Sales Managers Collective members should be readily available from a review of Defendant's personnel, scheduling, time, and payroll records, and from input received from the collective action as part of the notice and "opt-in" process provided by 29 U.S.C. § 216(b).

32. Defendant's reclassification of Sales Development Representatives from exempt salaried positions to non-exempt hourly positions in early 2025 demonstrates that Defendant was aware of its misclassification scheme and knew that its sales employees were entitled to overtime compensation under the FLSA. However, Defendant willfully and deliberately refused to reclassify Sales Managers when it reclassified Sales Development Representatives, despite the fact that Sales Managers performed substantially similar inside sales job duties and worked comparable hours from their home offices.

33. Thus, all Sales Managers Collective members are victims of Defendant's pervasive practice of willfully refusing to pay its employees overtime compensation for all hours worked per workweek above forty, in violation of the FLSA.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

### *Account Executives Collective*

34. Plaintiff Mark Barry seeks to bring this suit to recover from Defendant unpaid overtime compensation and liquidated damages pursuant to the applicable provisions of the FLSA, 29 U.S.C. § 216(b), on his own behalf, as well as on behalf of those in the following collective:

> Current and former employees who, during the applicable FLSA limitations period, held the position of Account Executive or similar title, worked remotely from their homes performing inside sales duties, and who consent to opt-in to this action ("Account Executives Collective").

35. Defendant treated Plaintiff Barry and all Account Executives Collective members similarly in that they all: (1) performed substantially similar inside sales job duties, including managing client accounts and territories, conducting outbound prospecting through phone calls and emails, performing discovery calls with prospects, facilitating virtual product demonstrations, preparing proposals and sales materials, and generating revenue through active sales efforts; and (2) did not perform exempt-level administrative functions, but rather worked on the production side of the business focused on generating sales revenue.

36. Defendant further treated all Account Executives Collective members similarly in that they: (1) were classified as exempt administrative employees despite performing primarily sales functions and revenue-generating activities; (2) were required to work in excess of forty hours per workweek, typically ranging from fifty to sixty hours per week; and (3) were not paid the required one and one-half times their respective regular rates of pay for all hours worked per workweek in excess of forty.

37. At all relevant times, Defendant was aware of the requirements to pay Account Executives Collective members at an amount equal to the rate of one and one-half times their respective regular rates of pay for all hours worked each workweek above forty, yet Defendant purposefully and willfully chose not to do so.

38. The precise number of Account Executives Collective members should be readily available from a review of Defendant's personnel, scheduling, time, and payroll records, and from

input received from the collective action as part of the notice and "opt-in" process provided by 29 U.S.C. § 216(b).

39. Defendant's reclassification of Sales Development Representatives from exempt salaried positions to non-exempt hourly positions in early 2025 demonstrates that Defendant recognized these inside sales employees were entitled to overtime compensation. Account Executives performed substantially identical job duties to the reclassified Sales Development Representatives, conducting outbound prospecting, facilitating virtual demonstrations, and building sales pipelines from their home offices, yet Defendant willfully and deliberately excluded Account Executives from the reclassification, demonstrating Defendant's knowledge of the misclassification while deliberately refusing to correct it.

40. Thus, all Account Executives Collective members are victims of Defendant's pervasive practice of willfully refusing to pay its employees overtime compensation for all hours worked per workweek above forty, in violation of the FLSA.

## BACKGROUND FACTS

### *Overview and Company Operations*

41. Defendant Anaqua, Inc. is a software and intellectual property management services company headquartered in Boston, Massachusetts, with a national and international client base that includes law firms and corporations across the United States and abroad.

42. Defendant's business operations consist of providing IP management software solutions, patent docketing services, renewal services, foreign filing services, data validation, portfolio onboarding, and patent search services to clients throughout multiple states and countries.

43. During the relevant time period, Defendant maintained a sales organization consisting of three primary inside sales positions: Sales Development Representatives (SDRs), Account Executives, and Sales Managers.

44. All three positions performed substantially similar inside sales work remotely from employees' home offices, using virtual communication tools such as Zoom, Microsoft Teams, and Salesforce CRM to conduct business operations.

45. Specifically, employees in all three positions performed outbound prospecting through phone calls, emails, and LinkedIn outreach, conducted discovery calls with prospective clients, facilitated virtual product demonstrations over video conferencing platforms, prepared proposals and sales materials, and managed sales pipelines and customer relationships through Salesforce and other CRM systems.

46. None of these positions involved traditional "outside sales" activities requiring regular face-to-face customer visits away from the employer's place of business or work location, as substantially all sales activities were conducted virtually from employees' home offices.

47. Despite the exclusively remote and inside sales nature of the work, Defendant imposed a company-wide practice of requiring Sales Development Representatives, Account Executives, and Sales Managers to work between fifty and eighty hours per workweek, without paying overtime compensation for any hours worked in excess of forty per workweek.

48. This systematic practice affected employees across Defendant's nationwide sales workforce, who were required to work extended hours including evenings and weekends to meet sales quotas and performance expectations while being denied overtime pay.

***Long Nguyen's Employment***

49. Defendant hired Plaintiff Long Nguyen as a Sales Manager on or about May 9, 2022. During his first week of employment through approximately May 16, 2022, Nguyen participated in training on Defendant's products, sales processes, and systems. In June 2022, Defendant assigned Nguyen a territory and accounts to manage.

50. Defendant compensated Nguyen with a base salary of $100,000 plus a target commission of $100,000.

51. Throughout his employment, Plaintiff Nguyen worked remotely from his home office and performed his job duties virtually using phone, email, video conferencing, and Salesforce CRM systems.

52. Plaintiff Nguyen's primary job duties consisted of building Defendant's sales pipeline through inside sales activities performed from his home office. Specifically, Nguyen spent approximately eighty percent of his time researching companies, analyzing their patent environments and needs, identifying key decision-makers and departments, making cold calls to prospects, sending prospecting emails, introducing Anaqua's solutions to potential clients, offering virtual product demonstrations, and logging all sales activity in Salesforce. The remaining twenty percent of Nguyen's time was devoted to administration, internal meetings, and limited travel.

53. Plaintiff Nguyen reported directly to Joseph Dougherty, his manager, and participated in weekly check-in meetings with Dougherty to review his sales pipeline and performance. Nguyen also worked regularly with Michael Frechtman on product demonstrations and collaborated with teammates George Diaz, Mark R., and Nick S.

54. Plaintiff Nguyen's typical workday began at approximately 6:00 a.m. PST to accommodate meetings with Defendant's east coast-based team members and ended around 5:00

to 6:00 p.m. PST. Throughout his employment, Nguyen regularly worked well in excess of forty hours per workweek, and on average worked at least 60 hours per week.

55. Plaintiff Nguyen traveled only two to three times per year to attend trade shows and company events in cities including Las Vegas, Los Angeles, and Boston. Nguyen did not travel to meet with customers in person or engage in traditional outside sales activities.

56. Despite performing exclusively inside sales work from his home office, Defendant classified Plaintiff Nguyen as an exempt employee not entitled to overtime compensation.

57. Throughout his employment with Defendant, Plaintiff Nguyen was never paid overtime compensation of one and one-half times his regular rate of pay for any hours worked in excess of forty per workweek.

***<u>George Diaz's Employment</u>***

58. Plaintiff George Diaz signed an offer letter with Defendant on February 17, 2022, and commenced employment on February 28, 2022. Diaz's employment with Defendant continued through October 2023.

59. Defendant employed Plaintiff Diaz with the title of "Sales Manager" for the newly created law firm group. Despite this title, Diaz functioned as an individual contributor performing inside sales duties, not as a manager with supervisory authority. Diaz worked remotely from his home office in Friendswood, Texas. Defendant compensated Diaz with a base salary of $100,000 plus a target commission of $100,000.

60. Plaintiff Diaz's primary job duties consisted of inside sales activities performed remotely from his home office. Specifically, Diaz conducted outbound prospecting through phone calls, emails, LinkedIn outreach, and organized sales campaigns, including subscription renewal calls to existing customers. Diaz performed discovery calls with prospects and follow-up calls to

advance sales opportunities. Diaz facilitated virtual product demonstrations conducted over Zoom, Microsoft Teams, and similar video conferencing platforms. Diaz prepared proposals and sales materials, managed Salesforce and other CRM systems by logging activity notes and updating opportunity stages, and participated in internal meetings such as pipeline reviews, forecast calls, strategy discussions, and product training sessions.

61. Plaintiff Diaz did not supervise employees or have any direct reports. Diaz did not hire, fire, or conduct employee performance reviews. Diaz did not control budgets or create company policy. Rather, Defendant evaluated Diaz based on individual sales performance metrics. Although Defendant's offer letter initially stated that Diaz would report to Jonathan Newcombe, Senior Vice President of Global Sales, Diaz initially worked under the direction of Domenic Leo, Vice President & General Manager of Law Firms. Beginning in approximately April 2022, Joseph Dougherty became Diaz's direct day-to-day manager, handling pipeline reviews, performance management, and approval of key sales matters.

62. Plaintiff Diaz typically started his workday between 6:30 and 7:00 a.m. and usually finished between 6:00 and 8:00 p.m. Diaz often worked through lunch and performed additional work in the evenings several times per week. Diaz regularly worked at least some weekends to complete email correspondence, follow-up activities, pipeline work, and other sales-related tasks.

63. On average, Diaz worked approximately sixty to sixty-five hours per week during his employment with Defendant. During travel weeks and quarter-end or year-end periods, Diaz's hours were often even higher.

64. Throughout his employment, Plaintiff Diaz traveled away from his home office on only five occasions for Defendant's business. Four of these five trips were for internal company

meetings, sales kickoffs, or industry conferences involving booth duty and networking, with no in-person customer sales meetings.

65. In February 2023, Diaz created a territory plan proposing more in-person travel and client visits, but Defendant's management did not approve most of the proposed travel and kept Diaz in a primarily remote, inside-sales work model.

66. Only one trip during Diaz's entire employment, to Chicago in June 2023 to meet with Mayer Brown LLP and McAndrews, Held & Malloy, involved actual in-person meetings with prospective customers.

67. Despite regularly working well in excess of forty hours per workweek, Defendant never paid Plaintiff Diaz overtime compensation of one and one-half times his regular rate of pay for any hours worked in excess of forty per workweek.

***<u>Mark Barry's Employment and Duties</u>***

68. Defendant hired Plaintiff Mark Barry pursuant to an offer letter dated November 17, 2021. Barry commenced employment with Defendant on December 13, 2021, and worked for Defendant until August 7, 2025, approximately three and one-half years.

69. Defendant employed Plaintiff Barry with the title of Account Executive, Law Firms. Barry worked remotely from his home office, initially in Chandler, Arizona, and then relocated to Boston, Massachusetts approximately three years prior to his termination, where he continued to work remotely from his home office.

70. Defendant compensated Plaintiff Barry with a starting base salary of $75,000.00 per year, plus a sales target incentive of up to $60,000.00 in commission. By the time of his termination, Barry's base salary had increased to approximately $87,000.00 per year through annual raises of two to three percent, in addition to commission eligibility.

71. Plaintiff Barry's primary job duties consisted of inside sales and revenue generation activities performed remotely from his home office. Specifically, Barry managed Defendant's small law firm territory and accounts in Salesforce, generated new business opportunities, and worked to maximize revenue through active sales efforts. Barry worked with Sales Development Representatives to build sales pipelines, conducted outbound calls and emails to prospects, performed virtual product demonstrations and discovery calls with potential clients, prepared proposals and drafted Master Service Agreements, collaborated with solutions consultants to address client needs, scheduled client meetings, conducted market research and competitor assessments, and maintained detailed activity notes and bookings in Defendant's CRM systems. Barry also provided training and guidance to an SDR assigned to work with him.

72. Plaintiff Barry's typical workday began between 8:30 and 9:00 a.m. and extended to 5:00 or 6:00 p.m., though his hours regularly extended well beyond this schedule.

73. During virtually every week, Barry consistently worked fifty to sixty hours per week, including evenings and additional time for strategic planning and creative preparation necessary to penetrate the challenging small law firm market.

74. Throughout his employment, Plaintiff Barry reported initially to Parker Vail, Director of Inside Sales, with whom Barry maintained an excellent working relationship. Defendant later reassigned Barry to report to Joseph Dougherty, Head of Sales for US Law Firms, who became Barry's direct manager and handled his day-to-day supervision, pipeline reviews, and performance management.

75. Despite performing exclusively inside sales and revenue generation work from his home office, Defendant classified Plaintiff Barry as an exempt salaried employee not entitled to overtime compensation under the purported administrative exemption.

76. Plaintiff Barry's primary duty throughout his employment was revenue generation through direct sales activities, not the performance of office or non-manual work directly related to management or general business operations. Barry's job duties fell squarely on the production side of the business, generating sales and revenue for Defendant, thereby disqualifying him from the administrative exemption under the Fair Labor Standards Act.

77. Throughout his employment with Defendant, despite regularly working fifty to sixty hours per workweek, Plaintiff Barry was never paid any overtime compensation of one and one-half times his regular rate of pay for any hours worked in excess of forty per workweek.

***The Misclassification Scheme and SDR Reclassification***

78. Throughout the relevant time period, Defendant classified both its Sales Managers and Account Executives as exempt employees not entitled to overtime compensation. Specifically, Defendant classified Sales Managers as exempt outside sales employees under 29 U.S.C. § 213(a)(1), and classified Account Executives as exempt administrative employees under 29 U.S.C. § 213(a)(1).

79. These classifications were improper and unlawful. Both Sales Managers and Account Executives performed substantially identical inside sales work remotely from their home offices. Both positions conducted outbound prospecting through phone calls and emails, facilitated virtual product demonstrations over video conferencing platforms, performed discovery calls with prospects, prepared sales proposals, and managed customer relationships through Salesforce and other CRM systems. Neither position engaged in traditional outside sales activities requiring in-person customer visits, and neither position performed exempt-level administrative functions.

80. In or around early 2025, Defendant reclassified its Sales Development Representatives from exempt salaried positions to non-exempt hourly positions. This

reclassification occurred after Defendant realized that Sales Development Representatives had been misclassified and unlawfully denied overtime compensation in violation of the Fair Labor Standards Act.

81. However, when Defendant reclassified the Sales Development Representatives to hourly status, it told these newly-converted hourly employees that "there isn't any budget for OT," despite continuing to demand that these employees work between fifty and eighty hours per workweek to meet Defendant's sales quotas and performance expectations.

82. Most significantly, despite reclassifying Sales Development Representatives, Defendant deliberately failed to reclassify Account Executives or Sales Managers, even though their job duties functioned largely identically to those of Sales Development Representatives. All three positions used the same tools, performed the same activities, and conducted the same inside sales functions from their home offices.

83. This selective reclassification demonstrates Defendant's knowledge that its inside sales positions were misclassified and that employees in these positions were entitled to overtime compensation under the FLSA. Yet Defendant willfully chose not to correct this violation for all affected employees, instead limiting the reclassification only to Sales Development Representatives in a calculated attempt to minimize its financial exposure.

84. Further evidencing the non-exempt nature of the Account Executive position, after Defendant terminated Plaintiff Barry on August 7, 2025, Defendant did not eliminate his position or reassign his job duties to another exempt employee. Instead, Defendant redistributed Barry's Account Executive duties to lower-level hourly workers, demonstrating that the work Barry had performed was properly classified as non-exempt work requiring overtime compensation.

***<u>Defendant Terminates Mark Barry on the Exact Deadline for His FMLA Medical Certification</u>***

85. The sequence of events leading to Plaintiff Barry's termination reveals a deliberate and calculated campaign of retaliation in response to his protected request for FMLA leave, culminating in his unlawful termination on the precise deadline he was required to submit his medical certification.

86. In spring 2025, Barry's manager, Joseph Dougherty, began raising purported performance concerns despite Barry's long track record of success. On April 25, 2025, Dougherty denied Barry's request for a title change from Account Executive to Sales Manager, stating in an email that "Promotions are offered based on performance not tenure. Your target attainment in 2024 was only 61%."

87. Barry contested this denial, explaining that his 61% target attainment came after he had lost approximately twelve deals in FY24 due to factors beyond his control, including inadequate marketing support and pricing issues he had repeatedly brought to management's attention.

88. The situation escalated dramatically on July 18, 2025, when Dougherty subjected Barry to a barrage of verbal abuse during a Teams exchange. Dougherty called Barry "combative" and "passive aggressive," mocked Barry's professional suggestions about merging territories to improve success rates, and dismissed Barry's legitimate concerns about the challenges of the small law firm market segment. The hostile exchange left Barry shaken and concerned about his job security.

89. On July 21, 2025, Barry sent a detailed email to Dougherty attempting to "clear the air" and address the hostile treatment from three days earlier. In this email, Barry documented Dougherty's name-calling, the mocking of his ideas, and the increasingly tense working

relationship, emphasizing that his intentions were "not to be 'combative' every time I open my mouth" and expressing confusion over being labeled "passive aggressive."

90. On this same day, July 21, 2025, Barry contacted Defendant's Human Resources department to explore his options for taking medical leave. Barry met with Caroline Marcus, HR Manager, to discuss taking leave for a necessary carpal tunnel surgery on his left hand, as well as for mounting stress and anxiety that had "ballooned in the last year" due to the hostile work environment under Dougherty's management.

91. The very next day, July 22, 2025, Caroline Marcus issued Barry formal FMLA paperwork, including a Notice of Eligibility and Rights & Responsibilities under the Family and Medical Leave Act. This Notice confirmed Barry was eligible for FMLA leave and designated July 22, 2025, as his leave beginning date for his own serious health condition.

92. Most significantly, the FMLA Notice set a deadline of August 7, 2025, for Barry to submit his medical certification, a deadline that would prove to be the exact date Defendant chose to terminate his employment.

93. Shortly after receiving the FMLA paperwork, on or around July 24, 2025, Barry underwent hand surgery for his carpal tunnel condition. He took approximately two to three days of unpaid time off for the procedure, as he had insufficient paid sick time available.

94. During this period, Barry discovered a company-recorded Microsoft Teams meeting in which senior management, including Dougherty and an SVP, were heard discussing Barry's removal from the company, revealing their intent to terminate Barry despite his recent strong performance closing two deals in what was is his best quarter ever.

95. In late July or early August 2025, Barry took an approved PTO trip to Ireland to visit family. Before departing, Barry met with Jonathan Newcombe (SVP of Sales) and Joe

Dougherty, during which he was given assurances that he should "keep your head down" and that "the jig will go on" despite the "interesting time for the business."

96. Barry returned from his Ireland trip on August 6, 2025. Within twenty-four hours of his return, an ad-hoc meeting suddenly appeared on his calendar titled "connect with Jonathan."

97. On August 7, 2025, the exact deadline for Barry to submit his FMLA medical certification, Defendant terminated his employment. Jonathan Newcombe, SVP of Sales, and Susan Grover, Vice President of Human Resources, conducted the termination meeting. They informed Barry that his position was being eliminated as part of a "reduction in force" and emphasized that the termination was "not performance-related."

98. The stated reason for Barry's termination, a position elimination due to redundancy or reduction in force, was pretextual. Barry had received no prior disciplinary actions, write-ups, or performance improvement plans during his nearly four years of employment. Moreover, he had just completed his strongest quarter, closing two significant deals.

99. Further exposing the pretext, Defendant did not actually eliminate Barry's Account Executive position. Instead, immediately after terminating Barry, Defendant redistributed his job duties to lower-level hourly workers rather than leaving the position unfilled or reassigning the work to another exempt employee, demonstrating that the work was both necessary and properly classified as non-exempt.

100. The temporal proximity between Barry's protected FMLA inquiry on July 21, 2025 and his termination on August 7, 2025, a mere seventeen days later, and precisely on his medical certification deadline, combined with the direct evidence of management's discussion of removing him shortly after his FMLA request, establishes clear and convincing evidence that Defendant terminated Barry in retaliation for exercising his rights under the FMLA.

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANT**
*Unpaid Overtime under the FLSA*
*(All Plaintiffs and Collectives)*

101. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

102. 29 U.S.C. § 207(a) requires employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay for all hours worked exceeding forty in a workweek.

103. As described above, Defendant is an "employer" within the meaning of the FLSA, while Plaintiffs and all Sales Managers Collective members and Account Executives Collective members are "employees" within the meaning of the FLSA.

104. Plaintiffs and all collective members regularly worked in excess of forty hours per week, typically ranging from fifty to sixty-five or more hours per workweek, yet Defendant failed to compensate Plaintiffs and collective members in accordance with the FLSA's overtime provisions.

105. Defendant failed to compensate Plaintiffs and collective members for overtime by classifying them as exempt employees when they performed non-exempt inside sales work from their home offices, including conducting virtual demonstrations, making discovery calls, performing outbound prospecting, and building sales pipelines through CRM systems.

106. Defendant willfully violated the FLSA. Specifically, in early 2025, Defendant reclassified Sales Development Representatives from exempt to non-exempt status, demonstrating that Defendant knew its inside sales employees were entitled to overtime compensation. However, Defendant deliberately and willfully failed to reclassify Account Executives or Sales Managers

despite their substantially identical job duties, revealing Defendant's knowing violation of federal wage and hour laws.

107. Plaintiffs and all collective members are entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times their respective regular rates of pay.

108. Plaintiffs and all collective members are also entitled to liquidated damages, interest, attorneys' fees, and costs for Defendant's violations of the FLSA's overtime provisions.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANT**

*FMLA Interference in Violation of 29 U.S.C. § 2615(a)(1)*

*(Mark Barry Only)*

109. Plaintiff Barry repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

110. At all relevant times, Plaintiff Barry was an eligible employee under the FMLA, having been employed by Defendant for at least twelve months from December 13, 2021 through August 7, 2025, having worked at least 1,250 hours during the twelve months preceding his leave request, and having worked at a location where Defendant employed fifty or more employees within seventy-five miles.

111. At all relevant times, Defendant was an employer covered by the FMLA, employing fifty or more employees for each working day during each of twenty or more calendar workweeks in the current or preceding calendar year.

112. Plaintiff Barry suffered from serious health conditions requiring medical treatment, including carpal tunnel syndrome requiring surgical intervention and stress and anxiety requiring continuing treatment by healthcare providers.

113. On July 21, 2025, Plaintiff Barry provided proper notice to Defendant of his need for FMLA-qualifying leave by informing Defendant's Human Resources department of his medical conditions and need for leave to undergo carpal tunnel surgery and address work-related stress and anxiety.

114. On July 22, 2025, Defendant issued Plaintiff Barry a Notice of Eligibility and Rights & Responsibilities under the Family and Medical Leave Act, confirming his eligibility for FMLA leave and setting a deadline of August 7, 2025 for submission of medical certification.

115. Defendant interfered with Plaintiff Barry's FMLA rights by terminating his employment on August 7, 2025, the exact deadline for submitting his medical certification, thereby preventing him from exercising his FMLA leave entitlement and denying him the opportunity to take protected leave.

116. Defendant's interference with Plaintiff Barry's FMLA rights was intentional and designed to avoid its obligations under the FMLA, as evidenced by the temporal coincidence of his termination occurring precisely on his medical certification deadline.

117. As a direct and proximate result of Defendant's unlawful interference with his FMLA rights, Plaintiff Barry has suffered and continues to suffer economic loss including lost wages and benefits, emotional distress, and other damages for which he seeks an award of monetary damages and other relief, including liquidated damages.

## **THIRD CLAIM FOR RELIEF AGAINST DEFENDANT**

*FMLA Retaliation in Violation of 29 U.S.C. § 2615(a)(2)*

*(Mark Barry Only)*

118. Plaintiff Barry repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

119. Plaintiff Barry engaged in protected activity under the FMLA on July 21, 2025 when he contacted Defendant's Human Resources department and requested leave for his serious health condition, specifically for carpal tunnel surgery and for treatment of work-related stress and anxiety.

120. Defendant took adverse employment action against Plaintiff Barry by terminating his employment on August 7, 2025.

121. The temporal proximity between Plaintiff Barry's protected FMLA activity on July 21, 2025 and Defendant's termination of his employment on August 7, 2025, a mere seventeen days later, establishes a causal connection between the protected activity and the adverse action, particularly given that the termination occurred on the exact deadline for Barry to submit his FMLA medical certification.

122. Defendant's retaliatory motive is further evidenced by direct proof: a company-recorded Microsoft Teams meeting in which Barry's manager Joseph Dougherty and Senior Vice President Jonathan Newcombe were heard discussing Barry's removal shortly after his FMLA request, stating that "if things don't change with him, you'll have to get the job."

123. Defendant's stated reason for terminating Plaintiff Barry, that his position was being eliminated as part of a reduction in force, was pretextual.

124. The pretextual nature of Defendant's stated reason is established by multiple factors: (a) Barry had received no prior discipline or performance warnings; (b) Barry had just completed his strongest quarter, closing two significant deals; (c) Defendant redistributed Barry's job duties to lower-level hourly workers rather than actually eliminating the position; and (d) the termination occurred precisely on Barry's FMLA medical certification deadline.

125. Defendant's conduct was willful, intentional, and designed to punish Plaintiff Barry for exercising his rights under the FMLA.

126. As a direct and proximate result of Defendant's unlawful retaliation in violation of the FMLA, Plaintiff Barry has suffered and continues to suffer economic losses including lost wages, lost benefits, back pay, and front pay, as well as severe mental anguish and emotional distress, including depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages including liquidated damages and other relief.

**FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT**

*Failure to Pay Wages in Violation of Minimum Fair Wages Law, M.G.L. c. 151 and Massachusetts Wage Act, M.G.L. c. 149 § 14)*

*(Mark Barry Only*

127. Plaintiff Barry repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein

128. The Massachusetts Minimum Fair Wages Law requires employer to pay employees 1.5 times their regular rates of pay when working over 40 hours in a week, absent exceptions inapplicable here.

129. Similarly, the Massachusetts Wage Act, M.G.L. c. 149 § 148, requires timely payment of wages including commissions and unused vacation time at the time of termination.

130. Both the Fair Wages Law and Wage Act mandated treble damages plus attorneys' fees for employers' statutory violations.

131. As described above, Defendant is an "employer" while Plaintiff Barry is an "employer" within the meaning of Massachusetts law.

132. Plaintiff Barry regularly worked in excess of forty hours per week, typically ranging from fifty to sixty-five or more hours per workweek, yet Defendant failed to compensate Plaintiff Barry in accordance with Massachusetts overtime provisions.

133. Defendant failed to compensate Plaintiff Barry for overtime by misclassifying him as ab exempt employee when he performed non-exempt inside sales work from his home office, including conducting virtual demonstrations, making discovery calls, performing outbound prospecting, and building sales pipelines through CRM systems.

134. Defendant willfully violated Massachusetts law. Specifically, in early 2025, Defendant reclassified Sales Development Representatives from exempt to non-exempt status, demonstrating that Defendant knew its inside sales employees were entitled to overtime compensation. However, Defendant deliberately and willfully failed to reclassify Account Executives despite their substantially identical job duties, revealing Defendant's knowing violation of Massachusetts state wage and hour laws.

135. Plaintiff Barry is entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times his regular rate of pay, as well as any and all unpaid commissions and unused vacation time due and owing at the time of his termination.

136. Plaintiff Barry is also entitled to treble damages, interest, attorneys' fees, and costs for Defendant's violations of Massachusetts law.

137. Prior to commencement of this action, Plaintiff Barry filed an administrative complaint with the Massachusetts Attorney General's Fair Labor Division.

138. On March 20, 2026, Plaintiff Barry was issued and received a Private Right of Action Letter, authorizing him to file the instant action under Massachusetts law.

## JURY DEMAND

139. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs Mark Barry, George Diaz, Long Nguyen, and all FLSA Collective Members demand a trial by jury on all claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Mark Barry, George Diaz, Long Nguyen, and all FLSA Collective Members respectfully demand judgment against Defendant as follows:

a. A judgment declaring that the practices complained of herein are unlawful and in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., and all other aforementioned federal and state laws;

b. Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with Defendant, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein, including Defendant's ongoing misclassification of Account Executives and Sales Managers as exempt employees;

c. Designation of this action as an FLSA collective action on behalf of Plaintiffs and all similarly situated Sales Managers Collective members and Account Executives Collective members, and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all Sales Managers Collective members and Account Executives Collective members, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b), and tolling of the statute of limitations;

d. An award of all unpaid overtime wages for all hours worked in excess of forty hours per workweek at one and one-half times Plaintiffs' and all FLSA Collective Members' respective regular rates of pay, as provided for under the FLSA;

e. An award of liquidated damages in an amount equal to the unpaid overtime compensation due to Plaintiffs and all FLSA Collective Members, as provided for under the FLSA;

f. An award to Plaintiff Mark Barry of treble damages for all unpaid overtime wages, unpaid commissions, and unused vacation time in violation of Massachusetts law;

g. An award to Plaintiff Mark Barry of all damages for Defendant's interference with and retaliation against Barry in violation of the FMLA, including back pay, front pay, lost benefits, lost compensation, and all damages for severe mental anguish and emotional distress;

g. An award to Plaintiff Mark Barry of liquidated damages under the FMLA equal to the amount of wages, salary, employment benefits, or other compensation denied or lost to Barry by reason of Defendant's willful violations of the FMLA;

h. An award of compensatory damages to Plaintiff Mark Barry in an amount to be determined at trial to compensate Barry for severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and personal dignity, and emotional pain and suffering;

i. Pre-judgment and post-judgment interest, as provided by law;

j. An award to Plaintiffs and all FLSA Collective Members of reasonable attorneys' fees and costs as provided for under the FLSA and the FMLA; and

k. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

**MARK BARRY, GEORGE DIAZ, and LONG NGUYEN, on behalf of themselves, individually, and on behalf of all others similarly-situated**

By their attorneys,

By: */s/ Adam G. Gutbezahl*
Adam G. Gutbezahl (BBO #693275)
Lauren B. Haskins (BBO #696678)
**RUBERTO, ISRAEL & WEINER, P.C.**
255 State Street, 7th Floor
Boston, MA 02109
(617) 742-4200
agg@riw.com
lbh@riw.com

By: */s/ Michael R. Minkoff*
MICHAEL R. MINKOFF, ESQ.
(*pro hac vice* forthcoming)
**STEVENSON MARINO LLP**
2000 Deer Park Avenue
Deer Park, New York 11729
(212) 939-7231
mminkoff@stevensonmarino.com

Dated: April 27, 2026